1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **NORTHERN DISTRICT OF CALIFORNIA**
10         **SAN FRANCISCO DIVISION**
11
12  JOHN T. WILLIAMS,                              Case No. 12-cv-02091 NC
              Plaintiff,                          **ORDER RE: CROSS-MOTIONS FOR**
13                                                **SUMMARY JUDGMENT**
       v.                                         Re: Dkt. Nos. 11, 14
14
    MICHAEL J. ASTRUE, Commissioner of
15  Social Security,
16            Defendant.
17

18      Plaintiff John Williams seeks judicial review of the Commissioner of Social

19  Security's final decision denying Williams' claim for disability insurance benefits and

20  supplemental security income as a person disabled and unable to engage in substantial

21  gainful activity.  Both parties move for summary judgment.  The single issue on review is

22  whether substantial evidence supports the administrative law judge's ("ALJ") determination

23  of Williams' residual functional capacity.  The Court finds that the ALJ did not err in

24  weighing the medical and lay opinions and that substantial evidence supports his

25  assessment of Williams' residual functional capacity.  Accordingly, the Court DENIES

26  Williams' motion for summary judgment and GRANTS the Commissioner's cross-motion

27  for summary judgment.

28  //

# I. BACKGROUND

## A.    Agency Review

In June 2010, Williams applied for disability insurance benefits and supplemental security income claiming that knee problems, depression, and bi-polar disorder have rendered him disabled and unable to work since August 14, 2007. (AR 143-152.) The Social Security Administration ("SSA") denied Williams' request for both types of benefits on October 14, 2010. (AR 76-81.) Based on reports from Community Health Clinic Ole, Kaiser/Vallejo Medical Records, Janet Cain, Ph.D., and MDSI Physician Group, the SSA found Williams' condition was not severe enough to preclude him from working. (AR 76.) Regarding Williams' depression, bi-polar disorder, and substance abuse issues, the SSA found that Williams was able "to think, communicate and act in [his] own interest . . . to adjust to ordinary emotional stresses, and to get along with others, as well as to do [his] usual activities and to remember and follow basic instructions." (AR 77.) The SSA found that Williams' medical records indicate that despite some discomfort in his knee, he was "able to move about and to use [his] arms, hands and legs in a satisfactory manner." (AR 77.) While acknowledging that knee pain kept Williams from being employed as a car salesman, as he had been employed in the past, the SSA nevertheless found that Williams was capable of doing other work. (AR 77.)

Williams requested that his claim be reconsidered and submitted additional medical records from Clinic Ole. (AR 89, 90.) The SSA denied this request, too. (AR 90-96.) It found that Williams had a "successful left knee surgery with no evidence of any severe muscle weakness, nerve damage, atrophy, organ damage or inability to move about in a satisfactory manner." (AR 90.) In addition, it found that Williams' obesity did not result in any disabling or limiting condition. (AR 90.) The SSA likewise concluded that Williams' depression and alcoholism did not cause "any severe thought disorder, memory loss or brain damage," and that "no severe disabling condition has been demonstrated to prevent work activities." (AR 90-91.)

//

**B.     Administrative Review**

Williams sought administrative review of the SSA's decision.  (AR 98-101.)  At a hearing before Administrate Law Judge Paul G. Robeck on June 23, 2011, Williams testified about his mental and physical health and how that affected his ability to work. (AR 42-64.)  Vocational expert Linda Ferra also testified.  (AR 64-66.)

**1.     Williams' testimony at the June 23, 2011 hearing**

At the time of the hearing, Williams was fifty-one years old and living in a spare room at his ex-girlfriend's place.  (43, 49.)  Williams has three children, with whom he is not close.  (AR 48, 57.)  He was married in 1980 and divorced in 1993.  (AR 143-44). Williams reported in 2011 that his ex-wife had recently passed away from a drug overdose. (AR 369, 389.)  Williams receives food stamps and does not spend much money; his mother and ex-girlfriend help him with other expenses.  (AR 49.)  He generally takes the bus to do his grocery shopping, although he occasionally borrows his mother's or ex-girlfriend's car, or goes with his friend, Ken Hughes.  (AR 56, 200.)  Williams does all of his own cleaning and cooking.  (AR 56.)

Williams owns a house, 1800 Twin Creeks in Napa, California.  (AR 147.)  It is valued at $355,000.  (AR 147.)  His monthly mortgage payment is $1,342.93, and Williams rents the property for $1,800.  (AR 147-48.)  He claims his rental expenses are $1,767.29. (AR 148.)

Williams previously received disability benefits in 1999 and 2000 when his depression made him unable to work.  (AR 61.)  In 2001, he starting working again and made over $57,000 that year.  (AR 62.)  He worked for the next six-and-a-half years.  (AR 61.)  Although Williams seeks benefits with an onset date of August 2007, he worked briefly in 2009 as a car salesman and earned $1,000 in a few weeks.  (AR 45-46.)  He was let go in 2009 because he failed to show up regularly and was not making sales.  (AR 48.) He also had problems with his boss.  (AR 50.)  Williams applied for another job as a car salesman, but was denied.  (AR 46.)  Williams testified that "there have been periods of [his] life when . . . [he] was capable."  (AR 62.)  At those times, he "was getting therapy

and medication." (AR 62.) His depression fluctuates. (AR 54.). He asserts though that "this last turn around it got real worse as I got the ACL, they took me off my antidepressants, and I just went downhill." (AR 62.) Although he was once outgoing, he stated that he could not work as a car salesman anymore. (AR 56.)

Williams has been on antidepressants since 1995, and Serzone, the medication he was taking at the time of the hearing, "helps a lot." (AR 54-55.) In addition, starting six to eight months prior to the hearing, Williams attended two therapy sessions a week, one group session and one individual session, with Rita Hicks. (AR 59.) Williams stated that he suffers from anxiety and depression, and was recently diagnosed with post-traumatic stress disorder. (AR 59-60.) His days consist of watching TV; occasionally he attends an AA meeting. (AR 50.)

At the time of the hearing, he had not drunk alcohol since December 2010. (AR 51.) He has a prescription for medical marijuana, which he smokes a few times a month. (AR 51.) In 2009, Williams exercised for an hour a day, but his mental health now keeps him from exercising at all. (AR 50-51.)

Williams also has knee problems. In August 2006, he had surgery to repair his left ACL. (AR 52, 256.) Williams testified that his knee swells considerably when he has to stand on it for long periods of time. (AR 47, 53.) He claims his knee issues have altered the alignment of his body and causes pain in his hip as well. (AR 53.) He stated that he can walk about eight blocks before his knee will start hurting. (AR 58.)

### 2.    The ALJ's Findings

On July 8, 2011, the ALJ issued his decision, finding that Williams was not disabled by his knee issues or his mental health issues, and that he retained sufficient residual functional capacity for medium work. (AR 19, 22, 31.) The ALJ analyzed Williams' claims under the five-step evaluation process for determining disability. (AR 12-13); *see* 20 C.F.R. §§ 404.1520(a), 416.920(a). The ALJ considered evidence from medical sources, a lay person, and Williams' testimony. (AR 25-27.)

//

At step three, the ALJ considered whether the evidence in the record of Williams' knee pain and depression meets or medically equals the severity of impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is required for a finding of disability. (AR 25.)  Specifically, the ALJ found that the medical evidence did not support a finding that Williams' knee surgery and the subsequent swelling he claims to experience met or equaled the listed impairments, which included "evidence of a gross anatomical deformity," "chronic joint pain," and the "inability to ambulate effectively." (AR 25.)  The ALJ compared Williams' mental health symptoms to the impairments listed in 12.04 affective disorders, 12.08 personality disorders, and 12.09 substance addiction disorders. He compared Williams' symptoms with the impairments described in "paragraph B," which require a "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (AR 25); *see also* 20 C.F.R. pt. 404, subpt. P, app. 1.  The ALJ also compared Williams' symptoms of affective disorder with those listed in "paragraph C" of 12.04.  Under each of these scenarios, the ALJ found no evidence to support a finding that Williams' limitations met or medically equaled the impairments required under the listings.  (AR 25-27.)

The ALJ then considered the extent to which Williams' impairments, both physical and mental, limited his ability to do work in order to determine his residual functional capacity.  (AR 27-30.)  The ALJ considered first whether Williams suffered from a "medically determinable physical or mental impairment" and second, the extent to which the "intensity, persistence and limiting effects" of Williams' symptoms affected his functioning.  (AR 27.)  In this analysis, the ALJ weighed the opinions of various experts and treatment providers and considered Williams' testimony as well.  (AR 27-30.)  The ALJ accorded "much weight" to the opinion of examining physician Rose Lewis, M.D., who evaluated the impact of Williams' knee troubles and determined that Williams "could engage in a full range of medium activity." (AR 28.)  Because the ALJ found the assessment of Janet S. Cain, Ph.D., "generally consistent with the whole record," he

accorded it "weight." (AR 28.)  Cain diagnosed Williams with depressive and personality disorders and determined that he could "understand, carry out, and remember simple instructions." (AR 28.)  The ALJ accorded "little weight" to the opinion of John R. Brandes, Ph.D., who found that Williams had "substantial loss of ability to understand, remember, and carry out simple instructions, make judgments, respond appropriately to others, and deal with changes in a routine work setting," because it was inconsistent with other medical sources. (AR 29.)  The ALJ also accorded the opinion of Rita Hicks, MFT, "little weight" because he found her determination that Williams is "incapable of any type of work activity since June 2009" "inconsistent with treating sources and examining sources" and because "a marriage and family therapist is not an acceptable medical source." (AR 29.)  In addition to these sources, the ALJ considered the evaluations of two agency consultants, H. Skopec, M.D., and Patrice G. Solomon, Ph.D., regarding Williams' mental health status. (AR 28-29.)

**C.    The Appeals Council's Denial of Review**

Williams appealed the ALJ's decision to the Appeals Council on July 24, 2011. (AR 142.)  Williams' representative submitted a brief to the Appeals Council on January 5, 2012 arguing that the ALJ erred in assessing Williams' residual functional capacity by failing to accord Dr. Brandes' opinion sufficient weight, improperly rejecting the opinion of Rita Hicks, mischaracterizing the medical records from Clinic Ole, and discrediting Williams' testimony at the June 23, 2011 hearing. (AR 239-43.)  In conjunction with the appeal, Williams submitted a statement describing the circumstances of his trip to East Asia to visit his brother along with records from Napa County Health and Human Services, which document his treatment with Rita Hicks. (AR 244-46, 402-37.)

The Appeals Council considered the additional evidence, but determined that it did not provide a basis for changing the ALJ's decision. (AR 2.)  The Appeals Council denied Williams' request for review. (AR 1.)

//

## II. STANDARD OF REVIEW

A district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). "When the Appeals Council denies a request for review, . . . the ALJ's decision becomes the final decision of the Commissioner." *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). "[W]hen the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence." *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1163 (9th Cir. 2012).

The decision of the Commissioner should only be disturbed if it is not supported by substantial evidence or it is based on legal error. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal citation and quotation omitted). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (internal citation and quotation omitted). It is evidence that a reasonable mind would accept as adequate to support the conclusion. *Id.* "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (internal citation and quotation omitted).

When reviewing the ALJ's weighing of medical evidence, additional standards apply. *Id.*; 20 C.F.R. § 416.927. If a claimant has a treatment relationship with a provider and that provider's opinion is supported by clinical evidence and not inconsistent with the record, the provider will be given controlling weight. 20 C.F.R. § 416.927(c)(2). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Bayliss*, 427 F.3d at 1216 (internal citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate

reasons that are supported by substantial evidence." *Id.* Furthermore, if the treating physician's opinion is conclusory, brief, and unsupported by clinical findings, an ALJ need not accept it in light of conflicting opinions. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Generally, "the opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician." *Ryan*, 528 F.3d at 1198.

### III. DISCUSSION

Social Security regulations define residual functional capacity as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(c). In other words, a claimant's residual functional capacity is what he can still do despite his physical, mental, nonexertional, and other limitations. *Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir. 2001); *see also Valentine v. Comm'r, Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009) (residual functional capacity is "a summary of what the claimant is capable of doing (for example, how much weight he can lift)."). In determining a claimant's residual functional capacity, the Commissioner must evaluate the claimant's "ability to work on a sustained basis." 20 C.F.R. §§ 404.1512(a), 416.912(a).

Here, substantial evidence supports the ALJ's assessment of Williams' residual functional capacity. First, the ALJ properly weighed and evaluated the evidence in the record, including the medical opinions, the report of Williams' friend, Ken Hughes, and Williams' testimony. Second, the ALJ's residual functional capacity assessment accounts for the impairments Williams' suffers.

**A.    Substantial Evidence Supports the ALJ's Determination that Williams Is Capable of Medium Work.**

The ALJ determined that, in spite of his knee trouble and symptoms of depression, Williams retained the capacity to perform medium work. The ALJ added the additional limitation of only occasional interaction with co-workers, supervisors, and the public. Williams argues in his motion for summary judgment that, in reaching this conclusion, the

//

ALJ improperly weighed the medical opinions in the record, failed to take into account the opinion of a lay witness, and improperly discounted Williams' testimony.

### 1.    The ALJ properly weighed the opinion of Rita Hicks, MHT.

The ALJ accorded little weight to Rita Hicks, MHT, because her assessment is "inconsistent with treating sources and examining sources" and because "a marriage and family therapist is not an acceptable medical source." (AR 29.)  Williams argues that this was reversible error because Hicks' opinion is consistent with the record and because her status as a therapist is not a legitimate reason for rejecting her opinion.  Dkt. No. 11 at 20.

The distinction between "acceptable medical sources" and "other sources" is important because only acceptable medical sources can be considered treating sources and accorded great or controlling weight.  *See* 20 C.F.R. § 416.927(c).  Acceptable medical sources include licensed physicians, licensed psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  *See* 20 C.F.R. §§ 416.913(a), 416.913(a).  Medical sources not listed as an acceptable medical source are considered "other sources."  20 C.F.R. § 416.913(d)(1).  Licensed clinical social workers, therapists, public and private social welfare agency personnel, and rehabilitation counselors are not acceptable medical sources.  SSR 06-03p; *see also* 20 C.F.R. § 416.913(d).  As a therapist, Hicks is not an acceptable medical source under the regulations, and her opinion cannot be given great weight.

The ALJ did consider Hicks' opinion, but he gave it little weight because he found it inconsistent with other medical evidence in the record.  *See* 20 C.F.R. §§ 404.1527(c), 404.927(c) ("[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  Hicks opined that Williams suffered from post-traumatic stress disorder and depression, which severely affected his ability to work without interruptions from his illnesses, and that Williams had a substantial loss in his ability to understand and carry out simple instructions, make work-related decisions, and deal with routine work changes.  (AR 396.)  This conclusion is inconsistent with Dr. Cain, who opined that Williams could "understand, carry out, and remember simple instructions" as

well as "respond to routine changes in the work setting." (AR 306.)  Dr. Skopec reviewed Williams' record and concluded that Williams has no significant limitations and could understand and carry out all but very detailed instructions during a full work day, and could interact with peers and supervisors, but not the public.  (AR 329.)  Dr. Solomon reviewed Williams' record and found Williams capable of "simple work activities."  (AR 369.)

Williams' records from Clinic Ole do not address his capacity for work; however, they are inconsistent with Hicks' evaluation of the severity of Williams' mental health issues.  Michael Ward, M.D., of Community Health Clinic Ole examined Williams in November 2010 and found that Williams' "upbeat" presentation was inconsistent with depression.  (AR 354.)  Ward further opined that Williams' complaints about his mood were "likely related to substance abuse."  (AR 354.)  Williams' other records from Clinic Ole show that in April 2009 he was exercising an hour a day and preferred to continue with exercise rather than take medication to deal with anxiety associated with financial difficulties.  (AR 270.)  In June 2009, Williams presented symptoms of "mild depression" and started taking Lexapro.  (AR 269.)  Williams never filled his prescription for Lexapro, but instead took his mother's.  (AR 285.)  He stopped taking Lexapro after two months. (AR 281.)  Clinic Ole records from June 2010 indicate that Williams sought disability forms completed for depression.  (AR 281.)  The nurse practitioner who assessed Williams characterized the symptoms he described as "severe depression," but she also noted that they were "new issues."  (AR 281.)  She described Williams as well-dressed, alert, and exercising good judgment.  (AR 282.)  Ultimately, Clinic Ole concluded that it "d[id] not have the documentation to support disability."  (AR 282.)

In light of the evidence in the record that conflicts with Hicks' opinion, and the fact that Hicks is not an acceptable medical source and cannot be given great weight, the ALJ did not err in assigning little weight to her opinion.

## 2.    The ALJ properly weighed the opinion of Dr. Brandes.

The ALJ accorded "little weight" to Dr. Brandes' opinion because he found it "inconsistent with treating sources and examining sources."  (AR 29.)  The ALJ concluded

from the medical report that Brandes found Williams to have "moderate to mild impairment in terms of social functioning, abstract reasoning, and judgment," and to suffer from "a substantial loss of ability to understand, remember, and carry out simple instructions, make judgments, respond appropriately to others, and deal with changes in a routine work setting." (AR 29.) Williams asserts that Brandes was a treating or examining physician, and the ALJ failed to give specific and legitimate reasons for discounting his opinion. Dkt. No. 11 at 14. Williams argues that inconsistency with the record is not a reason to reject or discount Brandes' assessment, and in addition, that Brandes' opinion is not inconsistent with the record. *Id.*

An acceptable medical source can only be considered a treating source "when *the medical evidence establishes* that [the claimant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [his] medical condition(s)." 20 C.F.R. §§ 404.1502, 416.902 (emphasis added). A "treating physician is employed to cure, and also has a greater opportunity to know and observe the patient over the course of time." *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1038 (9th Cir. 2003). There is no magic number of visits required to establish a treatment relationship; "[r]ather, the relationship is better viewed as a series of points on a continuum reflecting the duration of the treatment relationship and the frequency and nature of the contact." *Id.* An acceptable medical source cannot be considered a treating source if the relationship is based "solely on [the claimant's] need to obtain a report in support of [his] claim for disability." 20 C.F.R. §§ 404.1502, 416.902.

Here, Brandes' report indicates that he "initially saw and treated" Williams on November 8, 2010. (AR 386.) Brandes explains that Williams "presented to the undersigned on November 8, 2010 for treatment and evaluation purposes. Mr. Williams is represented by his attorney . . . for social security disability purposes." (AR 389.) An MMPI-2 screening test Brandes conducted on Williams is dated November 9, 2010. (AR 388.) In his statement submitted to the Appeals Council, Williams states that he saw

Brandes on November 8, 2010, December 27, 2010, and January 11, 2011.  (AR 245.)  No medical records, treatment notes, or documentation in the record establishes that Williams saw Brandes in December, 2010 or January, 2011.  Nothing in the record suggests that Brandes was employed "to cure," and the duration of the treatment relationship seems to have spanned only one or two days in early November.  In the absence of any medical records that show that Brandes treated Williams, the inference is that Williams saw Brandes only in connection with his application for social security benefits.

Examining sources "examine but do not treat the claimant."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The uncontradicted opinion of an examining physician can be rejected only for clear and convincing reasons; if the examining physician's opinion is contradicted, the ALJ may reject it for specific and legitimate reasons.  *Id.*  The record indicates that Brandes examined Williams and concluded that Williams "cannot sustain viable employment given his current mental and emotional condition."  (AR 383-91.)  The record indicates that other sources—examining physician Dr. Cain, examining physician Michael Ward, M.D., and a nurse practitioner from Clinic Ole, as well as non-examining sources Skopec and Solomon—disagreed with Brandes' assessment.  Therefore, the ALJ must give specific and legitimate reasons for *rejecting* Brandes' opinion.

The ALJ did not reject Brandes' opinion, however; he merely accorded it less weight given the other evidence in the record.  A weighing of opinions is what is required of ALJ's under the regulations.  20 C.F.R. §§ 404.1527(c), 404.927(c) ("all of the following factors [are considered] in deciding the weight we give to any medical opinion": examining relationship, treatment relationship, supportability, consistency with the record as a whole, specialization, and any other factors that tend to support or contradict the opinion.); *see also* SSR 96-2p ("A finding that a . . . medical opinion is not entitled to controlling weight does not mean that the opinion is rejected."); 20 C.F.R. §§ 404.1527(c), 404.927(c) ("[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  The ALJ considered and weighed Brandes' opinion, as the regulations require.

1

### 3.     The ALJ considered the lay testimony.

2      "Lay testimony as to a claimant's symptoms or how impairment affects the claimant's

3    ability to work is competent evidence that the ALJ must take into account." *Molina v.*

4    *Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012).  The Ninth Circuit has held that competent lay

5    witness testimony "cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d

6    1462, 1467 (9th Cir. 1996).  The ALJ is not required, however, "to discuss every witness's

7    testimony on an individualized, witness-by-witness basis." *Molina*, 674 F.3d at 1114.  The

8    regulations require the ALJ to consider evidence from "other sources," which can include

9    family and friends, but "do not require the ALJ to provide express reasons for rejecting

10   testimony from each lay witness." *Id.*; *see also* 20 C.F.R. § 404.1529(c)(3) (Information

11   from "other persons," "which can reasonably be accepted as consistent with the objective

12   medical evidence and other evidence, will be taken into account.").  "[T]here is a distinction

13   between what an adjudicator must consider and what the adjudicator must explain in the

14   disability determination or decision."  SSR 06-03p.

15      Here, the ALJ cited to the Third Party Function Report completed by Williams'

16   friend, Ken Hughes, when evaluating whether Williams' impairments met or medically

17   equaled the listing required for disability.  (AR 25, 26.)  The ALJ relied on Hughes'

18   evaluation to conclude that although Williams tends to isolate, he does have a friend that

19   visits him, and that Williams is able to maintain his personal care and hygiene.  (AR 26,

20   25.)  As indicated from his written decision, the ALJ considered the evidence submitted by

21   Hughes.  The ALJ is not required to cite to this report at each step of his analysis or to

22   expressly state why he did not refer to Hughes' opinion in his assessment of Williams'

23   residual functional capacity.  It is sufficient that the ALJ considered Hughes' report as part

24   of the evidence of record when evaluating Williams' claim for disability.

25

### 4.     Substantial evidence supports the ALJ's specific findings regarding Williams' credibility.

26

27      Based on his analysis of the aforementioned medical opinions, the ALJ found that the

28   severity of Williams' claimed impairment was not substantiated by objective medical

1   evidence and thus considered the credibility of Williams' testimony in assessing his

2   capacity to work.  In determining that Williams' statements about the severity of his

3   symptoms were not credible, the ALJ considered the following evidence: that Williams'

4   daily activities were, at times, greater than he reported; that he stopped working for reasons

5   unrelated to his impairments; that he was not compliant in taking his medication; and that

6   he was able to travel to East Asia.  The ALJ emphasized that none of these factors were

7   "mutually exclusive" with disability, but rather that each indicated "the alleged symptoms

8   and limitations may have been overstated."  (AR 30.)

9       If the ALJ finds a claimant's testimony about the severity of his impairments

10  unreliable, "the ALJ must make a credibility determination with findings sufficiently

11  specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's

12  testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).  "In weighing a

13  claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies

14  either in his testimony or between his testimony and his conduct, his daily activities, his

15  work record, and testimony from physicians and third parties concerning the nature,

16  severity, and effect of the symptoms of which he complains." *Light v. Soc. Sec. Admin.*,

17  119 F.3d 789, 792 (9th Cir. 1997).  When substantial evidence supports an ALJ's specific

18  findings regarding a claimant's credibility, a court may not second-guess that decision.

19  *Thomas*, 278 F.3d at 958.

20      Here, the ALJ found indications that Williams' ability to work might be less impaired

21  by depression than he claimed.  Specifically, the ALJ found evidence in the record that

22  Williams stopped working in 2007 because had been laid off and that he left his job in 2009

23  because of problems with his boss.  The ALJ found that Williams' trip to East Asia shows

24  that he is capable of traveling and vacationing.  Williams asserts that his brother paid for his

25  trip and that he stayed with family the entire time.  (AR 245.)  But, the ALJ did not rely on

26  the fact that Williams took a trip to prove that Williams was not in need of financial

27  assistance.  Rather, the ALJ referred to this fact in support of his conclusion that Williams'

28  "alleged symptoms and limitations may have been overstated."

1   The ALJ also questioned the severity of Williams' symptoms based on his

2   inconsistent use of medication.  The record indicates that Williams never filled his

3   prescription for Lexapro, took his mother's medication for about two months, stopped

4   taking Lexapro all together, and repudiated his request for medication when he was asked to

5   submit to a drug test. (AR 269, 285, 281, 355.)  The ALJ made three specific findings

6   regarding Williams' ability to work, travel, and cope without medication, which he found to

7   undermine Williams' credibility.  These findings are supported by evidence in the record.

8   Accordingly, the Court does not second-guess the ALJ's decision.

9   **B.    The ALJ's Assessment of Williams' Residual Functional Capacity Properly
         Accounts for Williams' Limitations.**

10

11   Williams argues that the ALJ committed reversible error by failing to include

12   limitations in his residual functional capacity assessment that account for (1) his finding at

13   step two that Williams has severe mental impairments; and (2) his findings at step three that

14   Williams has "moderate difficulties" with concentration, persistence, or pace.  The ALJ

15   determined that Williams possessed the residual functional capacity "to perform medium

16   work" requiring the ability "to engage in simple, repetitive tasks with a specific vocation

17   preparation code of three or less." (AR 27.)  The ALJ further refined his determination and

18   limited his assessment of Williams' residual functional capacity to include only occasional

19   interaction with coworkers, supervisors, and the public.  (AR 27.)  Williams asserts that this

20   assessment does not adequately address the impairment in Williams' ability to concentrate,

21   to keep pace, or to persist in an activity.

22   In *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228-29 (9th Cir. 2009), the

23   Ninth Circuit affirmed an ALJ's residual functional capacity assessment that the claimant

24   could carry out, attend, and concentrate on all but the most detailed and complex tasks,

25   despite a finding a step two that the claimant suffered from severe mental impairments.  The

26   Ninth Circuit noted that "no authority support[s] the proposition that a severe mental

27   impairment must correspond to limitations on a claimant's ability to perform basic work

28   activities." *Id.*  Furthermore, the Ninth Circuit found that medical evidence in the record of

Case No. 12-cv-02091 NC
ORDER RE: SUMMARY JUDGMENT        15

1  the claimant's mental impairment supported the ALJ's assessment of the claimant's residual

2  functional capacity. *Id.* at 1229.

3       Here, the ALJ determined that the effects of Williams' mental health would limit him

4  to medium work requiring only simple, repetitive tasks with a specific vocational

5  preparation code of three or less. A vocational preparation code of three or less means that

6  it takes no more than three months, and as little as a short demonstration, to learn the skills

7  necessary to perform the work. 20 C.F.R. § 656.3. Williams does not assert that any other

8  regulation or case law indicates the proper means by which the ALJ should have accounted

9  for his determinations at steps two and three when assessing Williams' residual functional

10  capacity. Williams cites to 20 C.F.R. § 404, Subpart P, Appendix I, Section 12.00C(3) for

11  the premise that a claimant may have a "marked limitation in concentration, persistence or

12  pace" if he "cannot complete [simple tasks] without extra supervision or assistance," "or at

13  a consistent pace," "or without undue interruptions." Dkt. No. 11 at 15. This citation is

14  irrelevant; the ALJ did not find that Williams' has a marked limitation, and Williams does

15  not argue that he is markedly limited. Furthermore, like in *Bray*, the ALJ's determination

16  of Williams' residual functional capacity is supported by the evidence in the record.

## IV. CONCLUSION

17

18       After properly weighing the medical opinions and lay testimony in the record,

19  substantial evidence supports the ALJ's assessment of Williams' residual functional

20  capacity for medium work, with certain limitations. Plaintiff's motion for summary

21  judgment is DENIED. Defendant's cross-motion for summary judgment is GRANTED.

22       IT IS SO ORDERED.

23       Date: March 6, 2013

24                                          Nathanael M. Cousins
                                            United States Magistrate Judge
25

26

27

28